# UNITED STATES COURT OF APPEALS FOR THE SEVENTH CIRCUIT



| Everett McKinley Dirksen United States Courthouse | | Office of the Clerk |
| Room 2722 - 219 S. Dearborn Street | | Phone: (312) 435-5850 |
| Chicago, Illinois 60604 | | www.ca7.uscourts.gov |

## NOTICE OF ISSUANCE OF MANDATE

April 14, 2020

To:     Shig Yasunaga
        UNITED STATES DISTRICT COURT
        Central District of Illinois
        U.S. Courthouse
        Urbana , IL 61802-3369

| | |
|---|---|
| No. 19-1380 | JEFFREY ORR, et al.,<br>Plaintiffs - Appellees<br><br>v.<br><br>LOUIS SHICKER, Doctor, et al.,<br>Defendants - Appellants |
| No. 19-1387 | JEFFREY ORR, et al.,<br> Plaintiffs - Appellees<br><br>v.<br><br>WEXFORD HEALTH SOURCES, INC.,<br> Defendant - Appellant |
| No. 19-1732 | JEFFREY ORR, et al.,<br>Plaintiffs - Appellees<br><br>v.<br><br>WEXFORD HEALTH SOURCES, INC.,<br>Defendant - Appellant |

| Originating Case Information: |
| --- |
| District Court No: 2:08-cv-02232-HAB<br>Central District of Illinois<br>District Judge Harold A. Baker |

| Originating Case Information: |
| --- |
| District Court No: 2:08-cv-02232-HAB<br>Central District of Illinois<br>Court Reporter Lisa Cosimini<br>District Judge Harold A. Baker<br>Clerk/Agency Rep Shig Yasunaga |

Herewith is the mandate of this court in this appeal, along with the Bill of Costs, if any. A certified copy of the opinion/order of the court and judgment, if any, and any direction as to costs shall constitute the mandate.

RECORD ON APPEAL STATUS:           No record to be returned

**NOTE TO COUNSEL:**

If any physical and large documentary exhibits have been filed in the above-entitled cause, they are to be withdrawn ten (10) days from the date of this notice. Exhibits not withdrawn during this period will be disposed of.

Please acknowledge receipt of these documents on the enclosed copy of this notice.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

Received above mandate and record, if any, from the Clerk, U.S. Court of Appeals for the Seventh Circuit.

**Date:**                                          **Received by:**

_____4/14/2020_____              _____s/T. CRONK_____

form name: **c7_Mandate**(form ID: **135**)

In the

# United States Court of Appeals

## For the Seventh Circuit



CERTIFIED COPY
A True Copy
Teste:

Deputy Clerk
of the United States
Court of Appeals for the
Seventh Circuit

———————————

Nos. 19-1380, 19-1387 & 19-1732

JEFFREY ORR, *et al.*

*Plaintiffs-Appellees,*

*v.*

LOUIS SHICKER, *et al.,*

*Defendants-Appellants.*

———————————

Appeals from the United States District Court for the
Central District of Illinois.
No. 08-cv-2232 — **Harold A. Baker**, *Judge.*

———————————

ARGUED NOVEMBER 4, 2019 — DECIDED MARCH 23, 2020

———————————

Before WOOD, *Chief Judge*, and BAUER and BRENNAN, *Circuit Judges.*

WOOD, *Chief Judge.* Plaintiffs are current and former inmates of the Illinois Department of Corrections (IDOC) who have been diagnosed with hepatitis C. They filed this lawsuit over ten years ago after fruitless efforts to receive treatment for their disease while incarcerated. Invoking 42 U.S.C. § 1983, their complaint alleges that the diagnostic and treatment

protocols for IDOC inmates with hepatitis C violate the
Eighth and Fourteenth Amendments. After many years, many
motions, and the consolidation of many cases, the district
court granted class certification and preliminary injunctive re-
lief. The defendants—IDOC, Wexford Health Sources, Inc.,
and several doctors—asked us to accept an appeal from that
decision under Federal Rule of Civil Procedure 23(f). We
agreed to do so and now reverse the grant of class certification
and vacate the injunction.

## I

### A.  Hepatitis C

Hepatitis C is a disease caused by the hepatitis C virus
(HCV). Those who contract HCV may suffer inflammation of
the liver, which can impair the functioning of that vital organ.
HCV has six genotypes, the first of which predominates in the
United States.

A hepatitis C infection is categorized as either acute or
chronic. In the acute phase, the infection does not necessarily
result in any noticeable symptoms, and some people naturally
clear the virus from their bodies. Others develop a chronic in-
fection. Persons suffering from a chronic hepatitis C infection
may develop fibrosis—that is, the build-up of scar tissue in
the liver—which can lead to cirrhosis, a severe condition caus-
ing the affected areas of the liver to stop functioning. Cirrhosis
is irreversible. The rate of fibrosis progression is not the same
in all HCV patients.

Several tests are available to determine the degree of fibro-
sis in a liver. One test, a FibroScan, uses ultrasound technol-
ogy. This test results in several possible scores: F0 (no fibro-
sis), F1 (mild fibrosis), F2 (moderate fibrosis), F3 (advanced

fibrosis), and F4 (cirrhosis). Another test is the AST (which stands for the enzyme aspartate aminotransferase) to Platelet Ratio Index, or APRI. The APRI is calculated by dividing the patient's AST level by her platelet count.

### B.  The Lawsuit's Early Years

Plaintiffs have all been diagnosed with hepatitis C. They filed this lawsuit in 2008, alleging that IDOC's medical directors and Wexford, a private company that administers healthcare to inmates in IDOC's custody, were deliberately indifferent to their medical conditions when they chose not to provide necessary treatment. Plaintiffs sought injunctive relief and class certification. In response to a motion from the defendants, the district court struck these requests.

In April 2009, Plaintiffs filed amended motions for class certification and injunctive relief; the district court denied those motions in November 2009. Two years later, the court dismissed Wexford from the suit with prejudice. In 2013, the court consolidated several related cases. The case dragged along until, in January 2016, Plaintiffs moved for reconsideration of the denial of class certification. The district court denied their motion, but it indicated a willingness to certify a class and so granted them leave to renew their request. The court noted that since the case was filed in 2008, there had been significant developments in the treatment of hepatitis C. In the beginning, the disease had virtually no cure free from serious risks and extensive costs. New treatments that were both significantly more effective and lower in cost had since become available.

In November 2016, Plaintiffs filed an amended complaint, naming IDOC, Wexford (again), IDOC's medical director

4                                    Nos. 19-1380, 19-1387 & 19-1732

(initially Dr. Michael Puisis, who was later succeeded by Dr.
Louis Shicker and then Dr. Steven Meeks), and several other
doctors as defendants. As before, they alleged that the defend-
ants were deliberately indifferent to their medical needs in vi-
olation of the Eighth and Fourteenth Amendments. They also
filed an amended motion for class certification and a motion
for injunctive relief.

In April 2017, the district court entered an order summa-
rizing the current status of the case. The order reviewed the
testimony given by witnesses and experts in 2016 and noted
that there was "no dispute that Hep C is a serious medical
condition or that it is present in significant numbers in the
IDOC prison population." The court nonetheless recognized
a "sharp dispute as to when treatment should begin." At the
time of the April 2017 order, IDOC's policy was to begin treat-
ment for inmates once their FibroScan score reached F3. Plain-
tiffs argued that treatment should begin as soon as possible.

The district court also found that "all inmates should be
tested for Hepatitis C upon admission" to IDOC. It deter-
mined that inmates "who test positively and have at least one
year to serve on their sentence from admission to release date
should be offered treatment with direct acting antiviral drugs
as soon as possible after diagnosis, and, in any event, no later
[than] testing at a fibrosis level of 2." Nevertheless, the district
court concluded that its findings were "too general to meet
the specific requirements of a preliminary injunction order"
and that it needed additional information about Plaintiffs' "fi-
brosis levels, contributing conditions, sentence length, etc."

In January 2018, Plaintiffs filed still another motion for in-
junctive relief; the district court scheduled an evidentiary
hearing for January 2019. (The court also consolidated this

case with three others in which Wexford remained a defendant.) In early January 2019, IDOC implemented an updated protocol for treating inmates with hepatitis C ("the 2019 Protocol").

### C.  The 2019 Protocol

Under the 2019 Protocol, IDOC contracts with the University of Illinois – Chicago ("UIC") for treatment of hepatitis C patients using a telemedicine system. The primary care physicians at each IDOC facility perform initial testing to ascertain which inmates are eligible for treatment at UIC. The UIC specialists then "determine the specific regimen for patients found ready for HCV treatment."

When an inmate enters IDOC's custody, he receives an HCV antibody test at the receiving and classification prison, unless he declines testing. If the test shows that the inmate is HCV positive and the inmate wants to be evaluated for possible treatment, further testing is performed at the prison to which the inmate is transferred, in order to "determine if the patient has chronic HCV disease or [if] the HCV infection has resolved (which can happen in about 15-25% [of cases])." If chronic HCV is present, IDOC physicians evaluate "absolute exclusion criteria"—in other words, they determine whether the inmate has less than 12 months remaining on his sentence, has refused treatment, has unstable medical or psychiatric conditions, or other contraindications to HCV therapy.

If no exclusionary factors are present, the inmate undergoes further tests, including a FibroScan and APRI calculation, to determine the severity of the liver disease, although the protocol states that a FibroScan should not be done for inmates with certain health conditions. Inmates with a

FibroScan of F2 or less are vaccinated against hepatitis A and B, where appropriate. Inmates with a FibroScan of F2 and whose APRI score is greater than or equal to .7 are referred to UIC. Inmates with FibroScan results of F3 or F4 undergo further testing before referral to UIC.

The 2019 Protocol also establishes priorities for the treatment of HCV-positive inmates. IDOC recognized that "[a]lthough nearly all patients with chronic hepatitis C infection are candidates for HCV therapy, there may be more urgency to treat certain patients first." Under the 2019 Protocol, priority level 1 for HCV treatment includes inmates with any of the following: cirrhosis; a comorbid medical condition associated with HCV; a Child Turcotte Pugh score of greater than or equal to 7; or newly incarcerated inmates who are already receiving HCV treatment. Priority level 2a includes inmates with FibroScan results of F3 or F4, an APRI score of greater than or equal to 2, Metavir Stage 3 or 4, a hepatitis B co-infection, or HIV. Priority level 2b includes inmates with a FibroScan result of F2 and an APRI score of greater than or equal to .7. Priority level 3 includes inmates with a FibroScan result of F0 or F1, and an APRI score of less than .7. The level 3 inmates are enrolled in the Hepatitis C Chronic Clinic, where they are seen every 12 months for (1) a targeted physical and other lab tests, (2) a FibroScan, (3) the calculation of their APRI, and (4) HCV education.

If an inmate is referred to UIC, all lab work and necessary forms are completed at the prison and forwarded to UIC. After the UIC practitioner sees the inmate, prescriptions or orders from UIC are faxed or forwarded to the prison "for medication changes, lab tests to be ordered, studies to be obtained, or special requests for the IDOC medical team to address."

Nos. 19-1380, 19-1387 & 19-1732                    7

The 2019 Protocol also requires that IDOC's medical director receive a monthly report of inmates determined to be ineligible for treatment and the reason why. It requires notification of the medical director when there are inmates who are eligible for treatment but who "are having significant delays … that could impact their ability to get treated while they are incarcerated."

### D.  *Lippert* Consent Decree

Also in January 2019, the state defendants (whittled down to Dr. Shicker, Dr. Meeks, and IDOC) filed a motion to stay the evidentiary hearing in light of another case, *Lippert v. Ghosh*, No. 10-4603 (N.D. Ill.). In *Lippert*, several IDOC inmates alleged that they were receiving inadequate medical care for various medical conditions in violation of the Eighth Amendment. They sought class certification and injunctive and declaratory relief. The district court in *Lippert* certified a class of "all prisoners in the custody of [IDOC] with serious medical or dental needs." In December 2018, the *Lippert* parties reached an agreement on a consent decree.

The consent decree, which was approved in May 2019, applies to "all prisoners in the custody of [IDOC] with serious medical or dental needs." It requires IDOC to implement changes in several areas, including chronic disease care, which covers HCV. Under the decree, IDOC will "provide sufficient nursing staff and clinicians" to complete medical evaluations within seven business days of an inmate's arriving at IDOC's receiving and classification prisons. If an evaluation shows that an inmate needs medical care, IDOC must ensure follow-up for appropriate care. In addition, the decree provides for the appointment of a court monitor to "conduct a staffing analysis and create and implement an

8                                  Nos. 19-1380, 19-1387 & 19-1732

Implementation Plan to accomplish the obligations and objectives in this Decree." Twice each year, the monitor will report to the parties and the court regarding compliance with the decree.

The *Lippert* consent decree includes a dispute resolution provision. If those plaintiffs believe that the defendants are not in substantial compliance with any provision of the decree, they are to provide written notice "referencing the specific provision or provisions" not being complied with to the defendants, who must then provide a written response within 30 days. If the plaintiffs reject the response, the parties must meet to try to resolve the dispute. If unsuccessful, the parties may jointly or individually seek relief from the court.

### E.  February 4, 2019 Order

We may now return to our case. The district court denied the state defendants' motion to stay the January 2019 hearing in light of the proposed consent decree in *Lippert*, finding that there were "no concrete proposals for treatment and handling of the combined cases." The court also denied Wexford's motion for reconsideration. On January 22 and 23, 2019, the district court conducted an evidentiary hearing on Plaintiffs' motions for class certification and injunctive relief. Many witnesses testified. Plaintiffs also provided a spreadsheet containing some medical information about the horde of named plaintiffs (approximately 1,800), including their APRI scores, which were calculated by a law clerk.

On February 4, 2019, the district court granted in part and denied in part Plaintiffs' motions for class certification and injunctive relief. First, the court certified two classes of inmates. Class 1 includes:

> All current and future prisoners in IDOC custody who
> have been, or will be, diagnosed with chronic hepatitis
> C virus, have at least six months or more remaining [on
> their] sentence, and who have not previously received
> treatment which resulted in a sustained viral response.

Class 2 includes:

> All current and future prisoners in the IDOC custody
> who have been, or will be, diagnosed with chronic hep-
> atitis C virus, have at least one year remaining on their
> sentence, have a fibrosis level of greater than or equal
> to two and an APRI score greater than or equal to .7,
> and have not received direct-acting antiviral drugs.

The court denied injunctive relief for Class 1, but it granted
an injunction for Class 2, finding that Plaintiffs had demon-
strated "a more than negligible chance that refusing treatment
for inmates with a fibrosis level of at least two could amount
to deliberate indifference." It acknowledged that the 2019 Pro-
tocol set treatment policies for inmates with a fibrosis level of
two or more, but it concluded that injunctive relief was neces-
sary because otherwise IDOC could abandon the protocol.
Moreover, it said, the 2019 Protocol "does not actually man-
date treatment" because it simply required the referral of in-
mates with a fibrosis level of two or more to UIC for "possible
HCV therapy." In addition, the protocol set no deadline for
"determining when HCV therapy starts."

On the record before it, the court concluded that the bal-
ance of harms "weighs in favor of granting a preliminary in-
junction that adopts, with some reasonable modifications, the
January 2019 protocol." It ordered Defendants to "commence
immediately the treatment of the class 2 plaintiffs' Hepatitis

C in accordance with" a modified version of the 2019 Protocol.
The new version added three requirements:

> (1) inmates with a fibroscan greater than two and an
> APRI greater than .7 will be referred to UIC and will
> receive HCV therapy unless UIC determines that treat-
> ment is contraindicated; (2) fibroscan and APRI levels
> will be determined within three months of admission
> to the IDOC; (3) HCV therapy will be started within
> three months of a determination that the fibrosis level
> is at least two and the APRI is at least .7.

Defendants appeal the class certification and injunctive re-
lief. We stayed the district court's order pending appeal.

## II

We review a district court's decision to grant or deny class
certification for an abuse of discretion. *Red Barn Motors, Inc. v.
NextGear Capital, Inc.*, 915 F.3d 1098, 1101 (7th Cir. 2019). Alt-
hough this is a deferential standard, it "must also be exacting"
because a decision regarding certification "can have a consid-
erable impact on the playing field of litigation." *Id.* The class
action is "an exception to the usual rule that litigation is con-
ducted by and on behalf of the individual named parties
only." *Califano v. Yamasaki*, 442 U.S. 682, 700–01 (1979).

Federal Rule of Civil Procedure 23 requires a plaintiff
seeking class certification to satisfy all four requirements of
Rule 23(a)—numerosity, commonality, typicality, and ade-
quacy of representation—and any one of the general catego-
ries of Rule 23(b). *Oshana v. Coca-Cola Co.*, 472 F.3d 506, 513
(7th Cir. 2006). "Failure to meet any of the Rule's require-
ments precludes class certification." *Arreola v. Godinez*, 546
F.3d 788, 794 (7th Cir. 2008). The party seeking class

Nos. 19-1380, 19-1387 & 19-1732                    11

certification bears the burden of showing by a preponderance of the evidence that certification is proper. *Bell v. PNC Bank, Nat. Ass'n*, 800 F.3d 360, 373 (7th Cir. 2015). The district court found that Plaintiffs satisfied all the requirements for class certification. Defendants retort that the proposed class is deficient in all respects.

We begin our analysis with Rule 23(a)'s numerosity criterion, which requires that the proposed class be "so numerous that joinder of all members is impracticable." FED. R. CIV. P. 23(a)(1). A "class can be certified without determination of its size, so long as it's reasonable to believe it large enough to make joinder impracticable and thus justify a class action suit." *Arnold Chapman & Paldo Sign & Display Co. v. Wagener Equities Inc.*, 747 F.3d 489, 492 (7th Cir. 2014). "While there is no magic number that applies to every case, a forty–member class is often regarded as sufficient to meet the numerosity requirement." *Mulvania v. Sheriff of Rock Island Cnty.*, 850 F.3d 849, 859 (7th Cir. 2017).

In its February 4 order, the district court found that numerosity was satisfied because "[j]oinder of all IDOC inmates with Hepatitis C, believed to exceed 2,000, is impractical." Plaintiffs add that numerosity is also easily satisfied because more than 1,800 individual plaintiffs have been added to the lawsuit. Defendants complain only that the district court did not cite any evidence showing the number of inmates included in each class.

While the district court ideally would have been more precise in its order, it did not abuse its discretion in finding that numerosity was satisfied. Plaintiffs showed that HCV is prevalent in prison populations. There are thousands of current and future IDOC inmates with hepatitis C. The real question

12                                    Nos. 19-1380, 19-1387 & 19-1732

is whether each of the two classes is sufficiently numerous for
class treatment. (The identified classes do not sweep in all
IDOC inmates with hepatitis C.)

For Class 1, we look at the number of current and future
prisoners in IDOC custody with hepatitis C who "have at least
six months or more remaining [on their] sentence, and who
have not previously received treatment which resulted in a
sustained viral response." While the record does not reflect
how many inmates, if any, have received treatment that re-
sulted in a sustained viral response, part of the problem is the
very lack of data and testing. Given what we do know about
the great number of prisoners with hepatitis C, it was permis-
sible for the district court to infer that there are enough *un-
treated* inmates to make joinder impracticable.

Finding numerosity is more difficult with Class 2 because
it is narrower. Nonetheless, there was (barely) enough evi-
dence to support the district court's finding of numerosity by
a preponderance of the evidence. Recall that Class 2 includes
all current and future prisoners with hepatitis C who "have at
least one year remaining on their sentence, have a fibrosis
level of greater than or equal to two and an APRI score greater
than or equal to .7, and have not received direct-acting antivi-
ral drugs." At the January 2019 hearing, Plaintiffs provided a
spreadsheet containing medical information for many of the
proposed class members. According to the spreadsheet, hun-
dreds of these inmates have an APRI greater than .7. Despite
significant gaps in the spreadsheet, we are willing to defer to
the district court's finding that Class 2 is "large enough to
make joinder impracticable."

Although others may have seen things differently, the dis-
trict court was also within bounds when it found that the

Nos. 19-1380, 19-1387 & 19-1732                                    13

commonality requirement was satisfied for both classes.
Commonality requires a plaintiff to show that "there are questions of law or fact common to the class." FED. R. CIV. P.
23(a)(2). A court need find only a single common question of
law or fact, but it needs to identify more than the fact that everyone suffered as a result of a violation of the same provision
of law. *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350, 359
(2011). Plaintiffs' claims "must depend upon a common contention … of such a nature that it is capable of classwide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each
one of the claims in one stroke." *Id.* at 350. The key to commonality is "not the raising of common 'questions' … but, rather, the capacity of a class-wide proceeding to generate common *answers* apt to drive the resolution of the litigation." *Id.*
"Dissimilarities within the proposed class are what have the
potential to impede the generation of common answers." *Id.*

In its February 4 order, the district court identified a common question of law or fact: "whether every inmate with Hepatitis C in the IDOC should be treated." Relying on advances
in medical treatment for hepatitis C, Plaintiffs argue that
every inmate with the disease should be treated as soon as
possible. They urge that IDOC's current policies, which do
not mandate treatment for all inmates who test positively for
hepatitis C, constitute deliberate indifference to a serious
medical need.

Defendants counter that there are no questions of law
common to each class because medical care, by its nature, is
individualized. Hepatitis C, they point out, progresses at different rates, and so treatment for each person requires discretion and will differ based on that person's medical history.

14                                    Nos. 19-1380, 19-1387 & 19-1732

This discretion is built into IDOC's policy. Moreover, inmates present with different risk factors and different responses to treatment, Defendants argue, and so certification of any class involving medical care is tricky and potentially dangerous.

Although the physical symptoms and progression suffered by each inmate undoubtedly vary, there is still a general question that can yield a common answer. Plaintiffs assert Eighth and Fourteenth Amendment challenges to Defendants' system-wide policies and practices, which allegedly reflect deliberate indifference to Plaintiffs' serious medical needs. Thus, "[w]hat all members of the [class] have in common is their alleged exposure, as a result of specified statewide [IDOC] policies and practices that govern the overall conditions of health care services[,] to a substantial risk of serious future harm to which the defendants are allegedly deliberately indifferent." *Parsons v. Ryan*, 754 F.3d 657, 678 (9th Cir. 2014). "[A]lthough a presently existing risk may ultimately result in different future harm for different inmates—ranging from no harm at all to death—every inmate suffers exactly the same constitutional injury when he is exposed to a single statewide … policy or practice that creates a substantial risk of serious harm." *Id.*

The common question for each class is thus the following: whether the specified policies and practices to which all IDOC inmates are subjected expose them to a substantial risk of harm. "These policies and practices are the 'glue' that holds together the putative class[;] either each of the policies and practices is unlawful as to every inmate or it is not. That inquiry does not require us to determine the effect of those policies and practices upon any individual class member (or class

members) or to undertake any other kind of individualized determination." *Id.*

Plaintiffs do not fare as well with Rule 23(a)'s typicality and representation requirements. Looking first at adequacy of representation, Rule 23(a)(4), we must decide whether the Plaintiffs have shown that the "representative parties will fairly and adequately protect the interests of the class." FED. R. CIV. P. 23(a)(4). A class representative must be part of the class and must "possess the same interest and suffer the same injury" as the other class members. *Wal-Mart*, 564 U.S. at 348.

We are stymied at the outset because, despite its certification of the two classes, the district court failed to name a representative for either class or to explain this omission. We thus have no way to assess adequacy of representation. On the assumption that the court would have accepted Plaintiffs' proposed representatives, we have different problems: this record does not reveal whether they would be adequate. In their most recent certification motion, Plaintiffs simply listed nine potential representatives' names and their (sometimes former) places of incarceration. This is not enough, nor does anything else fill the gap.

With respect to Class 1, we need a representative or representatives who are "current and future prisoners in IDOC custody," who have been diagnosed with hepatitis C, who "have at least six months or more remaining [on their] sentence, and who have not previously received treatment which resulted in a sustained viral response." Based on IDOC's website, at the time of the district court's February 4 order, six of the nine proposed class representatives were no longer in custody, and so they cannot serve. As for the other three, Plaintiffs

provided no evidence about whether any had received treatment that resulted in a sustained viral response.

For Class 2, the representatives must be "current and future prisoners in the IDOC custody" and must "have at least one year remaining on their sentence, have a fibrosis level of greater than or equal to two and an APRI score greater than or equal to .7, and have not received direct-acting antiviral drugs." Once again, Plaintiffs' evidence falls short. The six no longer in custody are equally inappropriate for Class 2. In addition, five of those six do not have a fibrosis level of two or more and an APRI score of .7 or higher, and thus they do not fit the criteria for Class 2. (There is no information about the fibrosis level or APRI score of the sixth person.) Of the three proposed representatives who remain in custody, Plaintiffs' most recent data shows that two have an APRI score lower than .7, and there is no evidence about the third's APRI score. "Rule 23 does not set forth a mere pleading standard. A party seeking class certification must affirmatively demonstrate his compliance with the Rule … ." *Wal-Mart*, 564 U.S. at 350. Plaintiffs have thus failed to demonstrate that their proposed class representatives are adequate. The district court erred by skipping this important step and finding, in the face of these facts, that Rule 23(a)(4) was satisfied.

The lack of a named representative also makes it impossible to find typicality. To satisfy the typicality requirement, Plaintiffs must show that the "claims or defenses of the representative parties are typical of the claims or defenses of the class." FED. R. CIV. P. 23(a)(3). Typicality requires "enough congruence between the named representative's claim and that of the unnamed members of the class to justify allowing the named party to litigate on behalf of the group." *Spano v.*

Nos. 19-1380, 19-1387 & 19-1732                                    17

*Boeing Co.*, 633 F.3d 574, 586 (7th Cir. 2011). As there is no
named representative, there is no way to compare anyone's
claims with those of the absentees. If we look at the nine prof-
fered representatives, typicality is missing because it appears
that they do not, or no longer, belong to either class.

As we said at the outset, a class can be certified only if it
meets all four criteria in Rule 23(a). Although we have no
quarrel with the district court's findings of numerosity and
commonality, Plaintiffs' showing of typicality and adequacy
of representation fall short. We thus conclude that the district
court abused its discretion in certifying these two classes.

## III

We now turn to the preliminary injunction. Before we ad-
dress the merits, we take a moment to explain which plaintiffs
are entitled to seek this remedy. Having rejected both of the
classes the district court certified, the classes are *not* the
proper parties at this point. But, as we noted, unlike in most
class actions, where only a small number of individual plain-
tiffs are suing on their own behalf and as possible class repre-
sentatives, in this case an extraordinary number of individual
plaintiffs joined the case personally—not as a class repre-
sentative, not as part of a class, but independently. We do not
know as much about these people as would be ideal, but
Plaintiffs proffered a spreadsheet at the hearing held on Janu-
ary 22 and 23, 2019, and that spreadsheet contains just enough
information to assure us that many of the more than 1,800 in-
dividual plaintiffs meet the following criteria:

- currently in IDOC custody,

- diagnosed with chronic hepatitis C virus,

- at least one year remaining on their sentence,

- fibrosis level of greater than or equal to two

- an APRI score greater than or equal to .7,

- have not received direct-acting antiviral drugs.

Plaintiffs' spreadsheet shows, for example, that Brandon Blasa, Ben McCreadie, Charles Sultan, and Nazim Useni all have hepatitis C, a fibrosis level of at least two, and an APRI score greater than .7. IDOC's website indicates that these inmates currently remain in IDOC custody, and they all have at least one year remaining on their sentences. While we do not know whether they have received direct-acting antiviral drugs, given that the 2019 Protocol was implemented only recently, we can assume that at least some have not. In other words, had Class 2 survived, they likely would have fallen within its scope. We therefore proceed to consider the merits of the preliminary injunction.

In its February 4 order, the district court granted relief to inmates in Class 2, and thus to individual plaintiffs meeting those criteria. It ordered Defendants to "commence immediately the treatment of the class 2 plaintiffs' Hepatitis C in accordance with" the 2019 Protocol. As we noted earlier, the court also slightly revised the 2019 Protocol by adding stricter referral and treatment requirements.

We review a district court's decision to grant a preliminary injunction for an abuse of discretion. *Girl Scouts of Manitou Council, Inc. v. Girl Scouts of U.S. of Am., Inc.*, 549 F.3d 1079, 1086 (7th Cir. 2008). "A preliminary injunction is an extraordinary remedy never awarded as of right." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008). In fact, a "preliminary injunction is an exercise of a very far-reaching power, never

Nos. 19-1380, 19-1387 & 19-1732                    19

to be indulged in except in a case clearly demanding it." *Girl Scouts*, 549 F.3d at 1085.

In *Winter*, the Supreme Court instructed that "[a] plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." 555 U.S. at 20. If the plaintiff fails to meet these requirements, the court must deny the injunction. The mere possibility of irreparable injury is not enough. *Id.* at 22. In each case, "courts must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief." *Id.* at 24 (cleaned up).

We start with likelihood of success on the merits. This case turns on the medical care that the individual plaintiffs still before us received and whether it was the result of deliberate indifference—*i.e.* the knowing disregard of a substantial risk of serious harm. *Petties v. Carter*, 836 F.3d 722, 728 (7th Cir. 2016). "To determine if the Eighth Amendment has been violated in the prison medical context, we perform a two-step analysis, first examining whether a plaintiff suffered from an objectively serious medical condition, and then determining whether the individual defendant was deliberately indifferent to that condition." *Id.* at 727–28.

Defendants contend that the district court erred in finding that the individual plaintiffs showed the necessary likelihood of success on the merits. They emphasize that the 2019 Protocol provides for treatment of F2, F3, and F4 inmates and, because the protocol was created by experts at UIC, it is impossible to say that the Defendants were deliberately indifferent.

We can assume for the sake of argument that these individual plaintiffs have shown an adequate chance of success. Hepatitis C is a serious medical condition. Under the 2019 Protocol, inmates in this class are "refer[red] to UIC for possible HCV therapy," but treatment is not guaranteed, and it comes only after the disease has progressed. Inmates with the described characteristics, we accept for present purposes, have a chance of succeeding because their disease has progressed far enough that treatment should no longer be discretionary (as long as there are no counterindications).

This takes us to irreparable harm, which we have defined as harm that "cannot be repaired" and for which money compensation is inadequate. *Graham v. Med. Mut. of Ohio*, 130 F.3d 293, 296 (7th Cir. 1997). "The moving party must demonstrate that he will *likely* suffer irreparable harm absent obtaining preliminary injunctive relief." *Whitaker By Whitaker v. Kenosha Unified Sch. Dist. No. 1 Bd. of Educ.*, 858 F.3d 1034, 1044 (7th Cir. 2017) (emphasis added). This requires "more than a mere possibility of harm." *Id.* at 1045; see *Winter*, 555 U.S. at 22. "Issuing a preliminary injunction based only on a possibility of irreparable harm is inconsistent with our characterization of injunctive relief as an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter*, 555 U.S. at 22.

The individual plaintiffs have not cleared that hurdle. The district court justified its contrary finding in its February 4 order, which stated that "the fibrosis test can be a rough indicator—a level two may actually be a level three. Combine this uncertainty with the inevitable prison delays means that waiting until level three could well create a substantial risk to

Nos. 19-1380, 19-1387 & 19-1732                              21

inmates of liver damage, liver cancer, and painful extrahe-
patic conditions."

We conclude, however, that the court's analysis was
flawed insofar as it found only that a substantial risk "could"
arise, not that irreparable harm was likely. The evidence pre-
sented during the preliminary injunction hearings was like-
wise equivocal. Many of the doctors testified that hepatitis C
is a slow-moving disease and that rates of progression vary
between individuals. Dr. Patel, a physician at UIC, testified
that there was "probably not significant harm without treat-
ment from stage 2 to stage 3." In 2016, Dr. Batey, a court-re-
cruited expert, testified that sometimes hepatitis C does not
progress for years in patients who do not undergo treatment.
This evidence does not show likely harm.

To be sure, the fact that a disease may progress slowly
does not mean that IDOC may refuse to treat it. But IDOC is
not refusing to treat inmates with hepatitis C. The 2019 Proto-
col lists very specific guidelines for diagnosing and treating
inmates with hepatitis C. The individual plaintiffs have not
shown that the treatment under the 2019 Protocol will likely
cause them irreparable harm.

The district court also feared that "[w]ithout an injunctive
order, the IDOC may abandon the current protocol." It was
concerned that the 2019 Protocol "does not actually mandate
treatment. Instead, inmates with level two or greater are re-
ferred to UIC for 'possible HCV therapy.'" The existence of
the *Lippert* consent decree, however, provides the assurance
that the court wanted. The *Lippert* class includes "all prisoners
in the custody of [IDOC] with serious medical or dental
needs." The consent decree covers inmates with chronic dis-
eases, specifically including HCV. It includes a dispute

resolution provision, which permits inmates to provide notice
to IDOC if they believe that IDOC is not in substantial com-
pliance with the decree. If the inmates and IDOC cannot reach
a resolution, either side may seek relief from the district court
overseeing *Lippert*. Thus, if IDOC were to "abandon the cur-
rent protocol," the individual plaintiffs in this case could seek
relief. And if inmates are not receiving treatment, but are
simply being "referred to UIC," they could seek relief under
the *Lippert* consent decree. The individual plaintiffs therefore
have not shown that they are likely to suffer irreparable harm
absent the preliminary injunction, and thus it was error to
grant injunctive relief.

## IV

The district court abused its discretion in certifying both
classes and in granting preliminary injunctive relief for Class
2 (or, more precisely, for the individual plaintiffs who meet
that class's criteria). We therefore VACATE its order and re-
mand for further proceedings consistent with this opinion.

# UNITED STATES COURT OF APPEALS FOR THE SEVENTH CIRCUIT



Everett McKinley Dirksen United States Courthouse
Room 2722 - 219 S. Dearborn Street
Chicago, Illinois 60604

Office of the Clerk
Phone: (312) 435-5850
www.ca7.uscourts.gov

**FINAL JUDGMENT**

March 23, 2020

Before:

DIANE P. WOOD, Chief Circuit Judge

WILLIAM J. BAUER, Circuit Judge

MICHAEL B. BRENNAN, Circuit Judge

CERTIFIED COPY
A True Copy
Teste:
Deputy Clerk
of the United States
Court of Appeals for the
Seventh Circuit

| | |
|---|---|
| Nos. 19-1380, 19-1387 & 19-1732 | JEFFREY ORR, et al., <br> Plaintiffs - Appellees <br><br> v. <br><br> LOUIS SHICKER, Doctor, et al., <br> Defendants - Appellants |

| **Originating Case Information:** |
|---|
| District Court No: 2:08-cv-02232-HAB <br> Central District of Illinois <br> District Judge Harold A. Baker |

The judgment of the District Court is VACATED and these appeals are REMANDED for further proceedings consistent with the opinion.

The above is in accordance with the decision of this court entered on this date. Each party shall bear their own costs.